UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2023 JAN -3 AM 8:47

CLERK
BY_____
DEPUTY CLERK

| | |
|---|---|
| Bunker Information Technology, LLC, a New Hampshire Corporation, | |
| Plaintiff, | COMPLAINT AND JURY DEMAND |
| v. | |
| Centrilogic, Inc., a Delaware Corporation, | Case No. 2:23-cv-1 |
| Defendant. | |

## INTRODUCTION

1. This case is about Defendant Centrilogic, Inc.'s ("Centrilogic's") failure to reasonably maintain a data center that it operates in Rochester, New York. Centrilogic's failure to maintain the data center according to reasonable industry standards resulted in a metallic, black dust accumulating on and infecting Bunker IT's equipment, necessitating its total replacement, and undermining Bunker IT's ability to meet its contractual obligations to its third-party customers.

## THE PARTIES

2. Plaintiff Bunker Information Technology, LLC, ("Bunker IT") is a New Hampshire corporation with its current principal place of business in Manchester, New Hampshire. Bunker IT is owned and operated by Neal Purchase, who is President and Director.

3. Bunker IT provides data services to healthcare clients who depend on reliability and consistent operating times to access over 30 million patient records.

4. These healthcare records – as well as prompt and reliable access to them – are vital to patient safety and wellbeing, essential for clinicians to perform their duties, and critical to the financial success of both Bunker IT and its healthcare clients.

5. At all relevant times described in the Complaint, Bunker Information Technology had its principal place of business in Calais, Vermont, and was organized as a limited liability company in Vermont.

6. Bunker IT still maintains employees in Vermont.

7. On information and belief, Defendant Centrilogic is a Delaware corporation with its principal place of business in Mississauga, Ontario.

8. On information and belief, Centrilogic has regional headquarters in Rochester, United States and Bracknell, United Kingdom.

9. On information and belief, Centrilogic is registered as a foreign business corporation in New York, New York, authorized to do business under N.Y. B.C.L. § 1304.

10. On information and belief, Centrilogic's registered agent in the State of New York is CT Corporation System, 28 Liberty Street, New York, NY 10005.

## JURISDICTION AND VENUE

11. This Court has personal jurisdiction over Centrilogic because Centrilogic conducted substantial business in Vermont and Bunker IT's claims arose from Centrilogic's acts directed toward Vermont, including the sale of data services to a Vermont corporation and almost 10 years of ongoing communications with Bunker IT and its employees in Vermont.

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

13.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Bunker IT's claims occurred within the United States District Court for the District of Vermont.

## FACTS

14.     Centrilogic provides data storage services and other information technology solutions, such as multi-cloud management, cloud-native application development solution, and strategic end-to-end digital transformation services.

15.     Centrilogic provides these services to a range of firms, from large corporations to smaller corporations throughout the United States, Canada, and England.

16.     Centrilogic operates data centers in Mississauga, Ontario; Toronto, Ontario; Vancouver, British Columbia; Rochester, New York, Buffalo, New York, Lenoir, North Carolina, the US Virgin Islands, and Bracknell, United Kingdom.

17.     Centrilogic's Rochester Data Center is located at 28 Mansfield Street, Rochester, New York.

18.     On information and belief, in September 2007, Centrilogic took over the Rochester Data Center from Verio, Inc., another data center operator.

19.     On information and belief, Verio, Inc., had purchased a former food-processing plant in 2001 and spent $12 million to renovate the plant and turn it into a data center.

20.     On information and belief, Centrilogic did not replace the Computer Room Air Conditioning ("CRAC") units or other components of the cooling system in the Rochester Data Center when it took over the center in 2007.

21. In the Fall of 2011, Bunker IT contracted with Centrilogic to provide colocation services and managed network services for Bunker IT and its clients in the Rochester Data Center in return for monthly payments.

22. On information and belief, that agreement was memorialized in a "2011 Order Form" signed by Neal Purchase and Robert Offley, President and CEO of Centrilogic.

23. On information and belief, pursuant to the "2011 Order Form," Centrilogic agreed to maintain, repair, and service the Rochester Data Center's network infrastructure, including air conditioning units, fire alarms, smoke alarms, and other infrastructure systems in the data center building that protected the integrity of the computer equipment and other technical hardware kept there by Centrilogic's clients.

24. On information and belief, the 2011 Order Form noted that Bunker IT was located in Calais, Vermont.

25. On information and belief, the 2011 Order Form purportedly incorporated a "Customer Contract for Hosting Services," ("the Customer Contract") but no representative of Centrilogic reviewed the terms of the "Customer Contract for Hosting Services" with either Neal Purchase or another representative of Bunker IT.

26. On information and belief, and although neither Neal Purchase nor another representative of Bunker IT reviewed the Customer Contract, as part of that Customer Contract, Centrilogic agreed to maintain, repair, and service the Rochester Data Center's network infrastructure, including air conditioning units, fire alarms, smoke alarms, and other infrastructure systems in the data center building that protected the integrity of the computer equipment and other technical hardware kept there by Centrilogic's clients.

27. For the next eight years, pursuant to the 2011 Order Form, Bunker IT purchased data storage services from Centrilogic in the normal course of business.

28. Throughout those eight years, Centrilogic mailed invoices to Bunker IT's principal place of business in Calais, Vermont.

29. Also throughout those eight years, Centrilogic's employees communicated with Mr. Purchase and Bunker IT's employees to address technical and billing issues.

30. On information and belief, on several occasions during the years of their business relationship, Centrilogic changed the terms of the purported Customer Contract without reviewing those terms with either Neal Purchase or another representative of Bunker IT and without Mr. Purchase or another representative of Bunker IT explicitly agreeing to the changed terms.

31. On information and belief, in 2017, the Rochester Data Center's Very Early Smoke Detection Apparatus ("VESDA") system failed and ceased functioning.

32. On information, the VESDA system in place was a primitive cloud chamber system.

33. On information and belief, even an up-to-date VESDA system that is not configured to be in a dirty environment will generate false alerts if the system detects carbon or metallic particulates.

34. On information and belief, Centrilogic did not repair or replace its primitive VESDA system after it failed in 2017.

35. In 2018, Bunker IT contracted with Centrilogic to begin storing data in Centrilogic's Buffalo Data Center, in addition to the Rochester Data Center.

36. The invoices related to the Buffalo Data Center were also mailed to Bunker IT's principal place of business in Calais, Vermont.

37. Beginning in December 2019, Bunker IT detected an increase in failure rates across a wider range of devices related to the Rochester Data Center, as compared to historical failure rates. Bunker IT equipment began experiencing unstable operation as well as abnormally increased rates of component failure. Servers, storage, and switching devices started to (and continue to) experience random system halts, reboots, shutdowns, and other data corrupting events. Failure rates started to be higher than normal for components such as motherboards, memory DIMMs, processors, I/O cards, hard drives, and even optical transceivers.

38. Because Bunker IT's initial supposition, which turned out to be incorrect, was that the failure rates to discrete issues with their equipment, in January 2020, Cody Schmidt, one of Bunker IT's employees, arrived at the Rochester facility to perform routine maintenance.

39. Part of the scheduled maintenance involved replacing multiple hard drives that had failed. The process of replacing a hard drive requires removing it from its host server, removing the hard drive caddy, and replacing the new hard drive in that existing caddy. After the process was complete, Mr. Schmidt noticed an unusual black residue on his hands.

40. Upon further inspection, Mr. Schmidt concluded that the black dust came from handling the failed hard drives. The black dust resembled fine metallic shavings with an oily residue mixed with black soot-like material. When handled, the black soot-like material separated from the metallic shavings revealing shiny silver or gray shavings, or in some cases a reddish-brown material.

41. Mr. Schmidt investigated the area within and outside Bunker IT's cage, looking for the metallic, black dust's source and the extent to which the black dust had spread. Mr.

Schmidt found that, with a simple finger swipe, he could gather dust from all of the equipment in Bunker IT's server cage.

42. The black dust had collected on the surfaces of the server, storage, and networking equipment in the server racks occupying Bunker IT's cage space and, even more concerning, it had infiltrated the interiors of the equipment.

43. Mr. Schmidt took pictures to document the spread of the metallic, black dust and notified Neal Purchase, president of Bunker IT.

44. At the time, neither Mr. Schmidt, nor Mr. Purchase connected the black dust to Bunker IT's ongoing equipment failures.

45. During a subsequent visit to the Rochester facility in July 2020 to install new servers, upgrade existing servers, and to repair hardware failures in Bunker IT's server racks, Mr. Schmidt and Mr. Purchase investigated and documented the extent of the black dust accumulation.

46. At this time, Mr. Schmidt and Mr. Purchase still failed to connect the black dust to Bunker IT's ongoing equipment failures, and instead assumed discrete issues caused the equipment failures.

47. Mr. Schmidt and Mr. Purchase returned to the Rochester Data Center again on the weekend of September 12–13, 2020, to investigate and repair additional hardware failures, including malfunctions with the recently installed new equipment in Bunker IT's server racks.

48. At this point, Mr. Schmidt and Mr. Purchase realized the black dust was a continuous, on-going problem likely causing catastrophic damage to the equipment.

49. Bunker IT immediately contacted an on-site Centrilogic resource representative who escalated the issue both to Centrilogic facilities and account management.

50. Bunker IT also opened a formal ticket through Centrilogic's customer support system.

51. On September 14, 2020, Bunker IT met with Centrilogic representatives, who assured Bunker IT that it would investigate the situation, locate the source of the dust, and resolve the situation.

52. On October 15, 2020, Bunker IT met with Centrilogic management and again explained that the black dust in the Rochester Data Center was causing ongoing problems with Bunker IT's equipment and that, relatedly, Bunker IT had lost clients and revenue due to the failures.

53. A Centrilogic employee promised to address the issues.

54. On information and belief, on November 13, 2020, Bunker IT and Centrilogic employees met via a Zoom call, during which Centrilogic informed Bunker IT that the black dust likely came from Computer Room and Air Conditioning ("CRAC") Unit 13, which had failed at around the time that black dust appeared in Bunker IT's equipment in early 2020, and that the issue had already been resolved by work performed by Roth Heating and Cooling sometime earlier in the summer of 2020.

55. On information and belief, on the November 13, 2020 call, a Centrilogic employee also promised to contact Centrilogic's insurance provider in order to compensate Bunker IT for its equipment damage caused by the failure of CRAC Unit 13.

56. A CRAC unit is a device that monitors and maintains the temperature, air distribution and humidity in a data center, network or server room.

57.  On information and belief, CRAC Unit 13 was a legacy air conditioning unit that had been in place prior to Centrilogic taking over the Rochester Data Center from Verio, Inc., in September 2007.

58.  Centrilogic's assertion that the issues with CRAC Unit 13 had been resolved was contradicted by Bunker IT's own observations from September 2020, which showed that the servers recently installed in July 2020 had already begun to accumulate black dust, just like the servers that had been installed much longer. Because Bunker IT's observations pointed to a persistent problem that required more information, Centrilogic and Bunker IT discussed the possibility of taking samples of the black dust for particle analysis.

59.  As December 2020 approached, Bunker IT continued to experience a disproportionate increase of error incidents at the Rochester facility. At the same time, there had been no further discussions with Centrilogic about taking black dust samples.

60.  Also around December 2020, Bunker IT's clients began to increasingly press Bunker IT to solve the high rate of error incidents.

61.  In March 2021, Bunker IT hired several experts to assist with collecting and testing samples of the black dust, to analyze the design of the Rochester Data Center, to model the possible airflow of the black dust, particularly the air flow from CRAC Unit 13 through Bunker IT's equipment, and to suggest some causes of the black dust.

62.  Bunker IT and its experts subsequently collected and tested samples of black dust that followed the likely flow of air from CRAC Unit 13 in a full circle through Bunker IT's equipment and back to the unit's inlet filter.

63.  Bunker IT's experts analyzed the black dust using three testing methods. The testing methods established that the collected dust was magnetic and that the iron and iron

containing compounds were not only present in all samples, but were the dominant element in all samples.

64. The Rochester Data Center was designed and built as a Raised Floor Data Center, with Perimeter Downflow Cooling Units, utilizing Convective Return Air. A Raised Floor Data Center operates on the principle of producing cool air using a "downflow" cooling unit and forcing the air into a "raised" sub-floor supply plenum. The floor is constructed using 2-foot square tiles that lock into one another to form an airtight seal. The result is a pressurized underfloor plenum of cool air that can be utilized to cool the information technology equipment placed on the floor.

65. A raised floor data center design is no longer industry standard for a number of reasons; in particular, as computing power has increased, raised floor data centers have struggled to provide the proportional amount of air necessary to cool facilities with increased power loads without producing pressure variations and reducing thermal efficiency.

66. A number of specific design factors in the Rochester Data Center do not comply with reasonable standards in the data storage industry, including: the shallow depth of the underfloor supply plenum limits the cooling that flows to high-density IT racks; the natural convective hot air return allows hot and cold air to mix in the room, thus driving down the thermal efficiency of the cooling units; the number of cooling units is high, given the shallow underfloor supply plenum, triggering exceedingly high underfloor air velocities and uneven underfloor pressure; not all IT racks in the data center have been arranged into a "hot aisle, cold aisle" configuration, causing uneven IT rack cooling and degrading the thermal performance of the room; the power to the racks is delivered by power cables under the raised floor, a widely

discontinued practice that obstructs the free flow of air in the (already compromised) subfloor and that leaks considerable pressure from the supply plenum, compromising the design further.

67.    The Rochester Data Center's reliance on 20-year-old downflow cooling units like CRAC Unit 13 also does not comply with reasonable standards in the data storage industry. This is because CRAC units designed twenty years ago cannot easily modulate their speed and tend to have component failures, specifically the belts wear out and the bearings fail as a result of heavy radial loads.

68.    A bearing failure in a CRAC unit can cause significant adverse effects as it will shed metal during the failure process, contaminating computer equipment along the CRAC unit's airflow with metallic particles.

69.    Bunker IT's analysis of the metallic, black dust is consistent with bearing failure in a CRAC unit because, when a bearing begins to fail, small iron metal particles will be produced and injected into the high-pressure cooling airstream. These iron particles can be injected into the air for a significant duration before the bearing completely seizes and the CRAC unit fails.

70.    Airflow analysis of the Rochester Data Center establishes that any failure in the components of CRAC Unit 13 would have the greatest influence on the Bunker IT racks, as they are closest to CRAC Unit 13 and are in the region of highest air velocities.

71.    All of Bunker IT's equipment contaminated with the black dust must be replaced because IT equipment contaminated with black dust becomes an inconsistent conductor of electricity and it is impossible to remove the dust from IT equipment or to adequately clean the equipment.

72. Any particle contamination and spread in a data center is outside acceptable industry standards for the data storage industry because particle contamination can cause system errors throughout the computer network.

73. As compared to the Buffalo Data Center also used by Bunker IT, the Bunker IT equipment in the Rochester Data Center has experienced 24 times more error incidents during the period from 2019 to 2021, when the black dust was discovered

74. The overall instability caused by the black dust in Bunker IT's equipment has compromised Bunker IT's ability to serve its current healthcare clients, to retain current clients, and to gain new clients.

## COUNT ONE: ORDINARY NEGLIGENCE

75. The allegations set forth in Paragraphs 1-73 are realleged.

76. Centrilogic holds itself out to be an expert in data storage and in providing data storage services.

77. Centrilogic maintains complete legal and physical control over the Rochester Data Center building and Bunker IT's server racks.

78. Centrilogic owed Bunker IT a duty of care attributable to a reasonable, careful, and prudent data storage facility in the industry.

79. Centrilogic owed Bunker IT a duty to maintain, repair, and service the Rochester Data Center's network infrastructure, including air conditioning units, fire alarms, smoke alarms, and other infrastructure systems in the data center building that protected the integrity of the computer equipment and other technical hardware kept there by Centrilogic's clients.

80. Centrilogic breached its duty to Bunker IT by:

a. Failing to maintain the Rochester Data Center and the critical equipment in the building, including the VESDA system and CRAC Unit 13, according to reasonable industry standards;

b. Operating the Rochester Data Center and the critical equipment in the building, including the VESDA system and CRAC Unit 13, in such a manner that allowed metallic, black dust to spread throughout Bunker IT's equipment; and,

c. Failing to update and repair the Rochester Data Center and the critical equipment in the building, including the VESDA system and CRAC Unit 13, to accord with reasonable industry standards.

81. Centrilogic further breached its duty because metallic, black dust would not occur in a data center operated according to reasonable industry standards, except for want of requisite care.

82. Centrilogic's breach of its duties caused Bunker IT injuries to Bunker IT's equipment and its customer relationships.

83. As a direct and proximate result of Bunker IT's negligence, Bunker IT has been damaged in an amount to be proven at trial.

## COUNT TWO: GROSS NEGLIGENCE

84. The allegations set forth in Paragraphs 1-82 are realleged.

85. Centrilogic holds itself out to be an expert in data storage and in providing data storage services.

86. Centrilogic maintains complete legal and physical control over the Rochester Data Center and Bunker IT's server racks.

87. Centrilogic owed Bunker IT a duty of care attributable to a reasonable, careful, and prudent data storage facility in the industry.

88. Centrilogic owed Bunker IT a duty to maintain, repair, and service the Rochester Data Center's network infrastructure, including air conditioning units, fire alarms, smoke alarms, and other infrastructure systems in the data center building that protected the integrity of the computer equipment and other technical hardware kept there by Centrilogic's clients.

89. Centrilogic and its employees knew for months that the VESDA system had failed and that CRAC Unit 13 had failed.

90. Despite the knowledge of Centrilogic's employees, Centrilogic failed to inform its customers, including Bunker IT, of either the failure of the VESDA system or the failure of CRAC Unit 13 and also failed to inform its customers, including Bunker IT, that the failure of the VESDA system and failure of CRAC Unit 13 could damage their computer hardware.

91. Despite the knowledge of Centrilogic's employees, Centrilogic neither investigated the source of the failure of the VESDA system nor the source of the failure of CRAC Unit 13.

92. The knowledge and conduct of Centrilogic and its employees showed a reckless indifference to the rights of its clients, including Bunker IT.

93. The reckless indifference of Centrilogic and its employees caused harm to Bunker IT's equipment and its customer relationships.

94. As a direct and proximate result of Centrilogic's gross negligence, Bunker IT has been damaged in an amount to be proven at trial.

## COUNT THREE: BREACH OF CONTRACT

95. The allegations set forth in Paragraphs 1-93 are realleged.

96. The 2011 Order Form signed by Neal Purchase and Robert Offley, President and CEO of Centrilogic is a valid agreement.

97. Pursuant to the 2011 Order Form, Bunker IT provided monthly payments to Centrilogic for colocation services and managed network services.

98. Pursuant to the 2011 Order Form, Centrilogic owed Bunker IT a contractual duty to maintain, repair, and service the Rochester Data Center's network infrastructure, including air conditioning units, fire alarms, smoke alarms, and other infrastructure systems in the data center building that protected the integrity of the computer equipment and other technical hardware kept there by Centrilogic's clients.

99. Centrilogic breached its duty to maintain, repair, and service the Rochester Data Center's network infrastructure, causing metallic, black dust to accumulate in Bunker IT's computer equipment.

100. Under the 2011 Order Form, Centrilogic had a contractual duty to ensure the Rochester Data Center was maintained in accordance with reasonable data center standards.

101. Centrilogic breached its contractual duty because metallic, black dust would not occur in a data center operated according to reasonable industry standards, except for want of requisite care.

102. As a result of Centrilogic's breach of this contract, Bunker IT suffered damages in an amount to be proven at trial.

**COUNT FOUR: BREACH OF WARRANTY**

103. The allegations set forth in Paragraphs 1-102 are realleged.

104. Centrilogic warranted that it would provide Bunker IT with a place to store its data that was maintained in accordance with reasonable data center standards.

105. Centrilogic failed to provide Bunker IT with a place to store its data that was maintained in accordance with reasonable data center standards because Centrilogic failed to maintain and repair the Rochester Data Center and allowed black, metallic dust to accumulate in Bunker IT's computer equipment.

106. As a result of Centrilogic's breach of this warranty, Bunker IT suffered damages in an amount to be determined at trial.

## REQUEST FOR RELIEF

1. Payment of $5,144,919.24 as of the date of this Complaint, representing the damage to Bunker IT's equipment caused by the black dust.

2. Compensatory and consequential damages, including expenses spent on resolving the issues arising from the black, metallic dust, such as employee time, and those Bunker IT customers and contracts lost as a result of Centrilogic's failure to maintain the Rochester facility.

3. Prejudgment interest.

4. Reasonable attorney's fees.

5. All other relief that is found just and reasonable.

## JURY DEMAND

Plaintiff Bunker IT respectfully requests a trial by jury on all issues so triable.

DATED at Burlington, Vermont, this 30th day of December, 2022.

                                        **BUNKER INFORMATION, INC.**

By: _/s/ (signed for)_
Devin T. McKnight, Esq.
Ian P. Carleton, Esq.
SHEEHEY FURLONG & BEHM P.C.
30 Main Street, 6th Floor
P.O. Box 66
Burlington, Vermont 05402-0066
dmcknight@sheeheyvt.com
icarleton@sheeheyvt.com
(802) 864-9891